PORT AFFILIATES, INC., Petitioner-Appellant,†

v.

Wisconsin DEPARTMENT OF REVENUE, Respondent-Respondent.

Court of Appeals

*No. 93–1755. Submitted on briefs April 13, 1994.—Decided December 20, 1994.*

(Also reported in 526 N.W.2d 806.)

†Petition to review denied.

For the petitioner-appellant the cause was submitted on the briefs of *Michael, Best & Friedrich*, with *Robert A. Schnur* and *Joseph A. Pickart*, of Milwaukee.

For the respondent-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Gerald S. Wilcox*, assistant attorney general.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SCHUDSON, J. Port Affiliates, Inc. (Port), appeals from the trial court judgment affirming a decision of the Wisconsin Tax Appeals Commission. The Commission affirmed a franchise tax assessment made by the Wisconsin Department of Revenue with respect to Port's taxable years 1984 through 1987. At issue in this appeal is the Department of Revenue's determination that computation of Port's apportionable income should include: (1) certain interest, dividends, and gains derived by Port from its investment portfolio of marketable securities, and (2) only a certain portion of rental losses incurred by Port in connection with an office building it owned. The Wisconsin Tax Appeals

Commission concluded that the Department's actions were proper, and the Commission's decision on these aspects of the assessment was affirmed by the trial court. We affirm.

## I.  BACKGROUND

The material facts are not in dispute. The taxpayer in this case originally was organized and incorporated in Wisconsin in 1918 as The Milwaukee Gear Company (MGC). Through approximately 1980, MGC's sole business activity was manufacturing and selling gears and gear drives. From about 1950 until the events involved in this case, MGC's activities were carried out at its manufacturing facility in Glendale, Wisconsin, where it also had its principle offices. In 1980, MGC developed an investment portfolio and, in 1983, MGC constructed an office building called the MG Atrium Building (Atrium) immediately in front of its Wisconsin facility. In 1984, MGC acquired a boat house and marina business in Florida and, later in 1984, MGC changed its name to Port Affiliates, Inc., and moved its principle offices to Florida. In its brief to this court, Port provided the background for these developments:

> Starting in about 1980, . . . E. Jack Borisch [MGC's chief executive officer] began to lose optimism in the future potential of gear manufacturing and decided that the future success of the taxpayer lay in other directions. As a result of this decision, starting in about 1980, the "excess" cash generated by the taxpayer's manufacturing operations (that is, the cash in excess of its needs for current operating and working capital) was no longer reinvested in those operations and, as a result, the size of the taxpayer's manufacturing operations (as measured by sales and number of employees) actually declined over

the next ten years. The taxpayer's "excess" cash . . . was set aside into an investment portfolio to be held for acquisitions in other industries and the taxpayer began an extensive effort to locate such acquisitions, at one point hiring a full-time employee who was given the sole responsibility of researching and searching for businesses to be acquired. Despite these efforts, no suitable acquisitions were located and the investment portfolio therefor[e] continued to increase in size, both by virtue of additions being made thereto by the taxpayer from the "excess" cash generated by the taxpayer's regular operations and by the reinvestment of earnings generated by the portfolio itself, so that the portfolio stood at about $6 million as of the beginning of 1984.

As another step in its diversification efforts, the taxpayer decided to take advantage of the fact that there was a large tract of land adjacent to its Wisconsin manufacturing facility, which was in a prime real estate development area. Accordingly, in 1983, it constructed an office building on such land for rental to outside tenants (the "MG Atrium").

In 1986, Port spun off the Milwaukee gear division of its operations into a wholly-owned subsidiary, incorporated in Wisconsin, called Milwaukee Gear Company, Inc. (MGC Inc.).[1] The MGC Inc. subsidiary

---

[1] In its brief to this court, Port explained:

At the end of 1985, the taxpayer determined that its manufacturing and boathouse marina activities constituted too much of a risk to its investment activities and, accordingly, it transferred its manufacturing operations and the boathouse marina to its newly formed wholly-owned subsidiary . . . . The taxpayer, however, retained the manufacturing plant, leasing it to the subsidiary, and it also agreed to provide certain management services to the subsidiary. After 1985, therefore, the taxpayer's sole business activity consisted of providing certain management functions to its subsidiary; during this period, it also continued to manage its investment

included not only the gear manufacturing business, but also the boat house and marina business. Port retained ownership of the gear manufacturing plant, but rented it to the subsidiary. Port also transferred six executives—five located in Wisconsin, and one in Florida—to the subsidiary. The undisputed findings of the Tax Appeals Commission's decision provide additional factual background:

> For most of 1984 and all of 1985, the activities of taxpayer, a corporation incorporated under Wisconsin law, included operating a Wisconsin-based manufacturing business, managing and maintaining an office building adjacent to the manufacturing facility occupied almost entirely by unrelated tenants, operating a boathouse marina located in Florida, and managing an investment portfolio.

> Late in 1985, however, taxpayer transferred its manufacturing and marina operations to a newly-formed, wholly-owned subsidiary, but retained ownership of the manufacturing facility and leased it to the subsidiary. In connection with the transfer, taxpayer also agreed to provide certain management services to the subsidiary. At the same time, the duties of physical maintenance of the office building were transferred to employees of the subsidiary.

> Thus, after 1985, the taxpayer's activities included continuing to manage the investment portfolio, continuing to manage (but not directly maintain) the Wisconsin office building, owning and leasing the Wisconsin manufacturing plant, and providing some management services to the manufacturing subsidiary.

portfolio in Florida and owned the MG Atrium in Wisconsin and the manufacturing plant (leased to its subsidiary) in Wisconsin.

In all years under review, the corporation's CEO spent about 15% of his corporate time on managing (with the assistance of brokers) the investment portfolio and 8% on managing office building matters. He spent the remaining 77% of his time on other corporate affairs, which in 1984-85 consisted of directly managing the Wisconsin-based manufacturing operation and the Florida-based marina business, and in 1986-87 consisted of leasing the plant to the subsidiary and of providing management services to the subsidiary.

In all years under review, taxpayer's controller, operating out of Wisconsin, involved himself in the administration of the investment portfolio which included "tracking when the investments were made" and giving advice to the CEO on what particular securities the company should purchase within the general guidelines established by the CEO.

In 1984, the CEO operated nearly the whole year out of a Wisconsin office. In 1985, he became a Florida resident, and in 1985-87, he operated 11 months of each year from a corporate office in Florida and one month a year from an office in the Wisconsin office building, the only office in the building not occupied by unrelated tenants.

Thus, in 1984 the CEO conducted his corporate responsibilities almost entirely through his Wisconsin office, but in 1985-87, mainly through his Florida office, though also through his Wisconsin office to a relatively minor degree.

The Commission determined that Port's investment activities were integrated with the rest of its activities. The Commission also determined that the Atrium was part of Port's business operations. Therefore, the Commission concluded that the investment income was derived from an activity constituting "an integral part of a unitary business" and, thus, that the

income was apportionable under § 71.07(1m)(b)9 and 10, STATS. The Commission also concluded that the rental losses at the Atrium were apportionable as losses from real property used in business under § 71.07(1m)(b)18.[2] Port argues that both of the Commission's conclusions were correct.

## II. STANDARD OF REVIEW

Although the facts are undisputed and the parties agree that this court now must review the Commission's conclusions, they have some disagreement over the exact standard of our review. Given the number and variety of statements attempting to define the standard of review in cases of this nature, their disagreement is understandable. Recently, however, we

---

[2] From 1984 through 1987, the investment income and Atrium losses were as follows:

| YEAR | INVESTMENT INCOME | ATRIUM LOSS |
|------|-------------------|-------------|
| 1984 | $730,967 | ($527,866) |
| 1985 | $648,484 | ($378,462) |
| 1986 | $534,294 | ($309,418) |
| 1987 | $483,630 | ($268,797) |

In its 1984 tax return, Port treated the investment income as apportionable income and, for 1985, 1986, and 1987, Port treated the investment income as nonapportionable and allocated all such income to Florida. Port's current position is that the investment income was nonapportionable for all four years. Port treated the Atrium loss as non-apportionable for all four years, and maintains that position. The Wisconsin Department of Revenue and the Commission concluded that both the investment income and the Atrium loss were apportionable for all four years.

summarized the appropriate standards governing our review of a decision of the Tax Appeals Commission:

> On appeal, we review the decision of the agency, not that of the circuit court. Our review of the commission's findings of fact is governed by sec. 227.57(6), Stats.:
>
> > If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action . . . if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.
>
> Substantial evidence is that degree of evidence which would allow a reasonable mind to reach the same conclusion as the agency.
> The appeal also involves review of the commission's interpretation and application of statutes—issues of law which we generally review *de novo*. We do, however, accord varying degrees of deference to an administrative agency's interpretation of a statute it has been legislatively charged to administer. Thus, we will defer to the agency's interpretation of such a statute when that interpretation "is of long standing" or "entails its expertise, technical competence and specialized knowledge," or when "through interpretation and application of the statute, the agency can provide uniformity and consistency in the field of its specialized knowledge." The supreme court also has held that "[w]here a legal question is intertwined with factual determinations or with value or policy determinations . . . [we] should defer to the agency which has

primary responsibility for determination of fact and policy."

And while the degree of deference owed to such interpretations has variously been described in the cases as "great weight," "due weight" or "great bearing," we believe the most recent statements on the subject by the supreme court have solidified the rule to provide that in cases where deference is appropriate under the standards just discussed, the deference to be accorded the agency's interpretation—however it may be characterized—is this: "[W]e will affirm the [agency's] interpretation of the statute if it is reasonable, even if another conclusion would be equally reasonable." Stated conversely, "[a] court does not . . . give deference to an agency's interpretation of a statute when the court concludes that the agency's interpretation directly contravenes the words of the statute, is clearly contrary to legislative intent, or is otherwise unreasonable or without rational basis."[3]

*Carrion Corp. v. DOR*, 179 Wis. 2d 254, 264-265, 507 N.W.2d 356, 359 (Ct. App. 1993) (citations omitted; alterations in original). Here, there is no dispute that the Tax Appeals Commission has expertise, technical

---

[3] A footnote in *Carrion Corp. v. DOR*, 179 Wis. 2d 254, 507 N.W.2d 356 (Ct. App. 1993), then stated:

> Where the agency's interpretation goes against the language of the statute being interpreted, or its legislative intent—or if it is inconsistent with the constitution or judicial authority—it is, by definition, unreasonable.
>
> And, finally, where the case is one of first impression—where "there is no evidence [that the agency has] any special expertise or experience" on the subject matter of the statute being interpreted—"the weight to be afforded [the] agency interpretation is no weight at all."

*Id.* at 265 n.3, 507 N.W.2d at 359 n.3 (brackets in *Carrion*; citations omitted).

competence and specialized knowledge regarding the interpretation and application of the statutory rules of apportionability. Further, there is no dispute that, in this case, the Commission's legal determination was intertwined with factual determinations. Accordingly, we do show deference to the Commission's conclusion and ask, simply, whether the Commission's conclusions were reasonable. We conclude that they were.

## III. STATUTES

As relevant to these issues, § 71.07(1m)(b), STATS. (1985),[4] provided:

(b) *Apportionable income.* Except as provided in sub. (2), corporations engaged in business both within and without this state are subject to apportionment. *Apportionable income includes all income or loss of corporations,* other than nonapportionable income as specified in par. (c), *including, but not limited to, income, gain or loss from the following sources:*

. . . .

9. *Interest and dividends if* the operations of the payer are unitary with those of the payee, or if those operations are not unitary but *the investment activity from which that income is derived is an integral part of a unitary business* and the payer and payee are neither affiliates nor related as parent company and subsidiary. In this subdivision, *"investment activity" includes decision making relating to the purchase and sale of stocks and other securities, investing surplus funds and the management and record keeping associated with corporate*

[4] Although the statute was enacted by 1985, Wis. Act 120, § 156(f), the parties agreed to have this statute apply to all the years involved in their dispute, including those preceding the statute's enactment.

*investments,* not including activities of a broker or other agent in maintaining an investment portfolio.

   10.   *Sale of intangible assets if* the operations of the company in which the investment was made were unitary with those of the investing company, or if those operations were not unitary but *the investment activity from which that gain or loss was derived is an integral part of a unitary business* and the companies were neither affiliates nor related as parent company and subsidiary. In this subdivision, "investment activity" has the meaning under subd. 9.

   . . . .

   18.   *Rentals of,* or royalties from, *real property* or tangible personal property *if that real property* or tangible personal property *is used in the business.*

   (c)   *Nonapportionable income.* 1. Income, gain or loss from the following sources are nonapportionable and shall be allocated to the situs of the property:

   . . . .

   b.   Rental of nonbusiness real property or nonbusiness tangible personal property.

(Emphasis added.)

## IV.   DISCUSSION

   The apportionment method of taxation can be applied when corporate activities in two or more states are so related that, as a practical matter, it is difficult if not impossible to determine the precise profit or loss attributable to the respective segments of the business conducted in each state. Accordingly, in Wisconsin, the state calculates the proportionate amounts of profit or loss in order to tax "that part of the income justly assessable in the state of Wisconsin." *Standard Oil Co.*

*v. Wisconsin Tax Comm'n,* 197 Wis. 630, 638, 223 N.W. 85, 88 (1929). The supreme court explained:

> In prescribing these methods of allocating income of persons doing business within and without the state, it is apparent that it was the legislative intent that the method prescribed should be so applied as to subject the income earned within the state to taxation and no more, the legislature quite evidently having in mind that it had no jurisdiction to tax income earned in other states.

*Id.* at 634, 223 N.W. at 87; *see also Consolidated Freightways Corp. v. DOR,* 164 Wis. 2d 764, 774, 477 N.W.2d 44, 48 (1991).

## A. INVESTMENT INCOME

Section 71.07(1m)(b)9, STATS., provides for the apportionment of investment income when either of two conditions is satisfied, only the second of which is applicable in this case. It subjects investment income to apportionment "if . . . the investment activity from which that income is derived is an integral part of a unitary business . . . ." In this case, therefore, the first issue is whether the Commission reasonably concluded that Port's investment activity was an integral part of a unitary business.

As quoted above, Port's own summary of the circumstances leading to the establishment of the investment portfolio demonstrates the integral relationship, from the very beginning, between the investments and Port's overall operations. To maintain its economic strength, Port sought to diversify and created the portfolio for that purpose. Further, throughout the time period considered in this case, Borisch made the major decisions for Port and its MGC Inc. subsidiary, including those decisions relating to

the investment portfolio. The computer system located in the Wisconsin office processed the data for both Port's investment activities and its other operations. Port's casualty and property insurance policies covered all the activities related to Port, the MGC Inc. subsidiary, and the investment activities. Port's retirement plan and health insurance policy covered all employees, including those connected to the investment activities. Finally, the investment income came primarily from short-term investments that remained within Port's control and that were always available as working capital.

Citing *Container Corporation of America v. Franchise Tax Board*, 463 U.S. 159 (1983), Port argues that, for investment income to be apportionable, "there must be some sharing or exchange of value not capable of precise identification or a measurement—beyond the mere flow of funds arising out of a passive investment . . . ." *Id.*, 463 U.S. at 166. The facts of this case, however, demonstrate far more than "the mere flow of funds arising out of a passive investment." Indeed, as stated in the January 1, 1986 "Management Agreement," between Port and MGC Inc., "Port shall, from time to time, advance to Gear sums of money necessary to finance capital equipment purchases and its working capital requirements." In fact, in 1987, the investment portfolio loaned MGC Inc. $500,000 in March and another $483,000 in April, at least in part for capital acquisitions. Thus, although Port argues that, despite the Management Agreement, it did not intend to use the investment income for operating expenses, the facts belie Port's claim.

Further, there was substantial evidence to support the Commission's conclusion that Port's management of the investment portfolio provided "operational effi-

ciencies" by being conducted in unity with Port's other operations. The Commission stated:

> The operational efficiencies to which we refer are several. First, there were managerial cost economies resulting from the fact that existing managers were able to absorb the additional responsibilities of running the investment division. No new managers were needed to be hired to manage this source of additional profit; therefore the company could spread its base managerial costs over more dollars of revenues, thereby reducing its unit management costs per revenue dollar.
>
> Second, there were similar efficiencies resulting from the more efficient utilization of physical assets. To conduct its operations, the investment division used existing equipment and real estate. The effect was to spread the fixed costs of these assets over higher revenues, again reducing unit costs.
>
> Finally, there were apparent cost economies that arose out of all units of the operation having a common health insurance plan, instead of dual plans, plans that, if purchased separately, one for the investment division and one for all the rest of the operations, would have resulted in greater overall health insurance costs.

Thus, the Commission correctly concluded that the three tests of unitariness—functional integration, centralization of management, and economies of scale—had been satisfied. *See Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 438 (1980).[5]

[5] Indeed, as Port concedes in its brief to this court:

It is true, of course, that some of the business executives of the taxpayer . . . devoted some of their time to the investment function . . . . Moreover, it is probably true that the taxpayer . . . incurred some "economic efficiencies" in running its investment

Port argues, however, that the Supreme Court's recent decision in *Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. —, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992), supports its position. Decided after the Commission's decision in the instant case, *Allied-Signal* considered the authority of New Jersey to tax an apportionable part of Allied-Signal Inc.'s income derived from its investment in ASARCO INC., a separate corporation. *Allied-Signal* reiterated that the unitary business principle remains an appropriate device for ascertaining whether a state has transgressed constitutional limitations in taxing a *nondomiciliary* corporation. *See id.*, 112 S. Ct. at 2258-2263, 119 L.Ed.2d at 545-552.

In this case, however, there is little dispute that Port and its predecessor corporation were incorporated and domiciled in Wisconsin.[6] Although Port offers intriguing arguments that such a distinction should make no difference, *Allied-Signal* repeatedly referred to the nondomiciliary status of the corporation being considered. The Supreme Court reiterated, "We are guided by the basic principle that the State's power to

activities and its operational businesses within the same corporate shell . . . .

[6] Port argues that the location of its "commercial domicile" was never at issue, and that, if it had been, it would have argued that its "commercial domicile" was in Florida. It argues that "the mere fact of legal incorporation" would not necessarily lead to the conclusion that it was domiciled in Wisconsin. Here, however, we have much more than the "mere facts of legal incorporation," given that Port and its predecessor were incorporated in Wisconsin and, for years, had operated primarily in Wisconsin. *See* 84 C.J.S. TAXATION 130 (1954) (generally, a corporation is domiciled for tax purposes in the state where incorporated).

tax an individual's or corporation's activities is justified by the 'protection, opportunities and benefits' the State confers on those activities." *Id.*, 112 S. Ct. at 2258, 119 L.Ed.2d at 546 (citation omitted). Thus, the domicile of the corporation indeed may have substantial bearing on the state's authority to subject investment income to apportionable taxation.

In this case, however, we need not determine whether the domiciliary/nondomiciliary distinction is significant because, as Port concedes, *Allied-Signal* does clarify certain principles of apportionable taxation that do apply to this case. Recognizing the "constitutional test" that "focuses on functional integration, centralization of management, and economies of scale," *id.*, 112 S. Ct. at 2260, 119 L.Ed.2d at 549, *Allied-Signal* also specified "a prerequisite to apportionment in all cases," and the taxpayer's burden to satisfy the prerequisite:

> What is required . . . is that the capital transaction serve an operational rather than an investment function. . . .
>
> . . . .
>
> It remains the case that "[i]n order to exclude certain income from the apportionment formula, the company must prove that 'the income was earned in the course of activities unrelated to [those carried out in the taxing] state.' "[7]

*Id.*, 112 S. Ct. at 2263, 119 L.Ed.2d at 552 (citations omitted; brackets in *Allied-Signal*).

---

[7] This is consistent with the longstanding rule that the taxpayer bears the burden of proof. *Woller v. Department of Taxation*, 35 Wis. 2d 227, 232, 151 N.W.2d 170, 172 (1967).

Clearly, as we have explained, in this case Port's investment portfolio served an "operational" function, and the income earned certainly was not "unrelated" to Port's activities in Wisconsin. The Commission correctly concluded that the investment activity was an integral part of Port's unitary business.[8]

## B. RENTAL INCOME/LOSS

Section 71.07(1m)(b)18, STATS., subjects rental income or loss from real property to apportionment "if that real property . . . is used in the business." If, however, such income or loss is from "nonbusiness real property," then it is nonapportionable under § 71.07(1m)(c)1.b., STATS. The Commission concluded that the Atrium was used in Port's business. The rental loss was apportionable because of Port's ownership of and close financial connection to the Atrium, and because of Port's active participation in the management of the Atrium. The Commission was correct.

Again, as quoted above, Port's own brief to this court explains that the Atrium was "another step in its diversification efforts." The purpose, according to Port, was "to take advantage of a large unused parcel of

---

[8] We also note that although *Allied-Signal* spoke in terms of "an operational *rather than* an investment function," it also recognized a situation in which investments can constitute " 'interim uses of idle funds "accumulated for the future operation of [the taxpayer's] business [operation]." ' " *Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. —, 112 S. Ct. 2251, 2263, 119 L.Ed.2d 533, 552 (1992) (emphasis added; brackets in *Allied-Signal; citation omitted*). The Supreme Court explained that, under such circumstances, the income still would have been apportionable. *Id.*

land" adjacent to its manufacturing facility. The Atrium was physically connected to that facility with a "bridge" or "passageway" and, as Port concedes, its CEO maintained an office there and its staff participated in the ongoing operations of the Atrium:

> Once the MG Atrium was constructed, a broker was hired to locate tenants and, by 1987, the MG Atrium was leased out to thirty tenants unrelated to the taxpayer or its subsidiary. No portion of the MG Atrium was used by employees to the taxpayer or its subsidiary except that one small office . . . was used by E. Jack Borisch for the short period each year when he was in town.
>
> The amount of time dedicated to the operation of the MG Atrium by the personnel of the taxpayer or its subsidiary was minimal. Irvin Albrecht, the taxpayer's Vice President of Operations of Milwaukee Gear, was charged with the responsibility of upkeep on all facilities located in Glendale but he allocated less than ten percent of his time to the MG Atrium. Furthermore, out of the 100 employees supervised by Mr. Albrecht, only one-half of one employee's time over the course of a year could be traced to the general maintenance of the MG Atrium, including such jobs as changing light bulbs, general maintenance of the grounds surrounding the MG Atrium, and snow removal. At no time during the rental of the MG Atrium did any of the 100 employees supervised by Albrecht repair any of the mechanical systems of the MG Atrium.

Although Port attempts to minimize its involvement in the Atrium, it does not dispute that the Atrium was a part of its overall, diversified business. Various funds, facilities, employees, and activities of Port and the Atrium were intermixed, and Borisch had responsibility for all major decisions regarding the Atrium, its

contracts, brokers, and expenditures. Thus, we conclude that the Commission reasonably concluded that the Atrium did constitute real property used in Port's business.

*By the Court.*—Judgment affirmed.